# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 4, 2020        Decided March 17, 2020

No. 19-1075

UNION PACIFIC RAILROAD COMPANY,
PETITIONER

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY
ADMINISTRATION, ET AL.,
RESPONDENT

---

On Petition for Review of an Order of the
United States Department of Transportation

---

*Tobias S. Loss-Eaton* argued the cause for petitioner. With him on the briefs were *Raymond A. Atkins* and *Matthew J. Warren*.

*Sushma Soni*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *Daniel Tenny*, Attorney, *Steven G. Bradbury*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel, *Peter J. Plocki*, Deputy Assistant General Counsel, and *Paul J. Roberti*, Chief Counsel, Pipeline and Hazardous Materials Safety Administration.

Before: HENDERSON and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* WILLIAMS.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

WILLIAMS, *Senior Circuit Judge*:  Union Pacific Railroad Company asks us to vacate a regulation that the Pipeline and Hazardous Materials Safety Administration promulgated under the Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 7302, 129 Stat. 1312, 1594–96 (2015) ("FAST"). The railroad contends that the regulation fell short in protecting the security and confidentiality of information it is required to disclose.

FAST § 7302[1] requires the agency to promulgate regulations governing disclosures to be made by railroads transporting hazardous materials.  The information is to aid federal, state and local first responders preparing for and combating emergencies and falls into two classes.

The first type of information includes, for any train carrying hazardous materials (as defined by the agency, see § 7302(b)(5); see also 49 U.S.C. § 5103), accurate, real-time "train consist information," which by statute includes the number of rail cars and the commodity transported in each car, § 7302(a)(1); see also § 7302(b)(7) (defining "train consist"). Railroads are to send this information to a secure "fusion center," § 7302(a)(2), which is a "collaborative effort" of

---

[1] FAST § 7302 is codified as a note to 49 U.S.C. § 20103.  For reader friendliness, we cite simply to § 7302 rather than the U.S. Code to sidestep ungainly references to subsections of a note, e.g., note(a)(3).

various government entities to combat "criminal or terrorist activity," 6 U.S.C. § 124h(j)(1).  In an emergency, the fusion centers release the information to local first responders.

The second type of required information is much more general and applies only to trains transporting particular types of flammable liquid, known in the statute as "high-hazard flammable trains."  § 7302(a)(3), (b)(6).  The statutorily mandated regulations are to require the information to be supplied to state authorities known as emergency response commissions.  The information is to include "a reasonable estimate" of the weekly number of trains that pass through each county and some identification of the flammable liquid being transported.  § 7302(a)(3)(A), (C).  These rough estimates allow first responders to know the risks they may face and to plan accordingly.

The statute's mandate as to "security and confidentiality" requires the agency to

> . . . establish security and confidentiality protections, including protections from the public release of proprietary information or security-sensitive information, to prevent the release to unauthorized persons [of] any electronic train consist information or advanced notification or information provided by Class I railroads under this section.

§ 7302(a)(6).

This case concerns the second type of information—the aggregated, county-by-county data.  In a separate rulemaking not at issue here, the agency is addressing the more detailed train consist information.  See Hazardous Materials: FAST Act Requirements for Real-Time Train Consist Information by Rail, 82 Fed. Reg. 6,451 (Jan. 19, 2017).

As required, the agency promulgated a regulation requiring railroads to provide state emergency response commissions with the aggregated data. See 49 C.F.R. § 174.312(b). By way of establishing "security and confidentiality protections," the regulation directs railroads to indicate to those commissions whether they "believe[]" any part of the information is "security sensitive or proprietary and exempt from public disclosure." *Id*. § 174.312(c). In adopting this directive to the railroads, the agency found it "sufficient to ensure confidentiality and security." See Hazardous Materials: Oil Spill Response Plans and Information Sharing for High-Hazard Flammable Trains (FAST Act), 84 Fed Reg. 6910, 6932 (Feb. 28, 2019) ("Final Rule"). The agency's basic idea was that notice of this sort would provide state agencies with the necessary "flexibility" to disseminate the information to the necessary recipients while also "guard[ing]" against inadvertent disclosure and enabling states to hold close any information that is at all sensitive and that may be protected by state law. *Id*.; see *id*. at 6917.

Union Pacific attacks the regulation as insufficiently protecting the railroad's data and thus failing to meet § 7302's requirement to establish security and confidentiality protections to prevent access to the information by unauthorized parties. Because the regulation is neither dependent on a misreading of the statute nor arbitrary and capricious, we deny the petition for review.

* * *

We do not understand the agency, in tackling its obligation under § 7302(a)(6) to "establish" "security and confidentiality protections" for the aggregated data, to have supposed that it could provide *no* protection for the aggregate data; certainly the railroad points us to no language adopting such a view. Where the parties clash is whether the agency can adopt the specific

protections at issue here, namely a scheme in which railroads alert the relevant state agency to the data that they believe the states should refrain from disclosing.

To the extent that the railroad might be arguing that FAST requires the agency to adopt the same protective scheme for *every* type of disclosed information, whether detailed train consist information or aggregated county-by-county reports, it is mistaken. Section 7302 creates multiple classes of information posing different levels of risk. And its wording reflects Congress's judgment that those differences should be accompanied by other differences. The very precise data go to fusion centers, the aggregate data to state emergency response commissions. For the very precise data, fusion centers and railroads must develop memoranda of understanding regarding how the centers will receive "secure and confidential access to the electronic train consist information," § 7302(a)(1)(B), whereas no such predicate is stated for the transfer of the more aggregated weekly data. These differences reflect Congress's evidently different purposes for the different types of mandated notice: responding to an emergency versus preparing for one.

By establishing this bifurcated scheme, Congress authorized the agency to adopt different measures appropriate for each type of data. Thus, just as the federal government maintains different levels of national security classification (e.g., top secret vs. secret), the agency may apply different protections for highly sensitive train consist information as compared to less sensitive aggregated data.

Union Pacific argues that the rule fails to fulfill the purpose of the security and confidentiality protections as set forth in § 7302(a)(6). Specifically it claims that the regulation's confidentiality protections do not pass muster because some states require their emergency response commissions to release such information under state freedom of information laws; thus,

competitors might glean the identity of a railroad's customers from the aggregated data, and these competitors may then poach a railroad's business. Appellant Br. at 2. And Union Pacific offers a textual hook for what is ultimately a policy argument: If a state releases this information to the public, everyone will have access to the information and the statutory category "unauthorized person" turns out (in such a state) to include no one at all.

This argument runs into two distinct problems:

First, as a pure matter of language, the agency's very modest solution here has given some substance to the term "unauthorized person": viewed across the nation, the regulation treats as unauthorized those persons not entitled to the information under the relevant state's freedom of information law. Further, contrary to the dissent's suggestion, this reading of the statute doesn't improperly subdelegate the agency's regulatory authority to states. See Diss. Op. at 5–6. The agency chose a type of security and confidentiality protection—aimed at protecting against inadvertent public disclosure (see immediately below)—and adopted regulations to effectuate that policy. It is no surprise that a statute which weaves state institutions into its program should lead the implementing agency to coordinate its action with aspects of state law. See, e.g., § 7302(a)(4) (delineating when a state emergency response commission is to disseminate information to a state "political subdivision," "public agency," or "law enforcement").

Second and most importantly, the agency made a specific uncontradicted finding that requiring the railroad to flag the information to the state response commissions was "sufficient to ensure confidentiality and security." Final Rule, 84 Fed. Reg. at 6932. It noted that the purpose of the statutory scheme is to allow state and tribal emergency response commissions

"to share information with local planning authorities." *Id.* It then concluded that its approach maintained "flexibility" and ensured that state agencies "disseminate information in accordance with State laws and procedures." *Id.* And it noted that the information covered by the rule "does not include customer information or other business identifying details." *Id.* As a result, the agency concluded, its

> approach will help guard against inadvertent public disclosure of protected materials by ensuring that the information that railroads believe to be confidential for business or security reasons is marked appropriately. Before fulfilling a request for information and releasing the information, States will be on notice as to what information the railroads consider inappropriate for public release.

*Id.*

We do not doubt Union Pacific's suggestion that aggregated data may sometimes reveal sensitive information upon analysis. Cf. *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980) ("[E]ach individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."). But during the administrative proceedings Union Pacific provided not a mote of evidence that the type of data at issue here has been or even could be so exploited. In fact, the agency repeatedly noted that "railroads have not demonstrated specific prospective harm that would be caused by the release of such aggregated information." Final Rule, 84 Fed Reg. at 6932; Hazardous Materials: Oil Spill Response Plans and Information Sharing for High-Hazard Flammable Trains, 81 Fed Reg. 50,068, 50,084 (July 29, 2016); see also Proposed Agency Information Collection Activities; Comment Request, 79 Fed Reg. 59,891, 59,892 (Oct. 3, 2014) ("Commenters do not

document any actual harm that has occurred by the public release of the information required to be provided to the States under the EO."). Neither before the agency not in this court, can the agency "be asked to make silk purse responses to sow's ear arguments." *City of Vernon v. FERC*, 845 F.2d 1042, 1047 (D.C. Cir. 1988).

Though couching its argument as one of pure statutory interpretation (based on the agency's allegedly rendering the "unauthorized persons" category meaningless), the railroad is principally making an argument that the agency acted arbitrarily in adopting the protections that it did. As we've observed, claims that an agency has adopted an impermissible construction of a statute and that an agency has acted arbitrarily both require the court to resolve whether the agency, "in effecting a reconciliation of competing statutory aims, has rationally considered the factors deemed relevant" by the statute. *Gen. Am. Transp. Corp. v. ICC*, 872 F.2d 1048, 1053 (D.C. Cir. 1989). Viewed as an APA arbitrary and capricious challenge, the claim requires the railroad to shoulder the burden of proof. *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002). That means Union Pacific must point to some evidence to substantiate its claim. See *Abington Crest Nursing & Rehab. Ctr. v. Sebelius* 575 F.3d 717, 722 (D.C. Cir. 2009). Union Pacific hasn't done so.

At oral argument, counsel argued that it would be difficult for Union Pacific to marshal historical evidence that its competitors had already used this aggregated data to identify and poach customers. But assuming the point's correctness, the railroad could (for example) have conducted an experimental analysis to demonstrate how a competing carrier might identify a customer by piecing together county-by-county information. It did not. As the adage goes, something (an agency's finding) beats nothing (Union Pacific's unsupported assertion) every time.

From our vantage point, the scope of disagreement between the majority and dissent is quite narrow. We all agree that the statute requires the agency to establish *something* to protect the information at issue. Diss. Op. at 2. Where we disagree is whether the agency has met the statutory directive. Here, the agency developed a mechanism to prevent inadvertent disclosure. See pp. 7–8 above. At that point we believe the court must move into the second part of our APA inquiry, where Union Pacific's failure to offer any data or even informed hypothesizing leaves us without authority to disturb the agency's factual finding. To be sure, the line between an agency misinterpreting statutory text versus acting arbitrarily can be difficult to draw—which is why judges may disagree on precisely when that line is crossed. But we believe that the agency recognized and acted in accordance with the statutory mandate—and so the question becomes how reasonable that action is in light of the factual record before us. Cf. Diss. Op. at 7.

\* \* \*

Because Union Pacific failed to provide evidence to controvert the agency's express finding that this rule will satisfy security and confidentiality concerns as mandated by the statute, the petition for review is denied.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: "Well done is better than well said." Benjamin Franklin, Poor Richard, 1737 (1737), *reprinted in* Poor Richard's Almanack 57 (U.S.C. Publ'g Co. 1914). The government would do well to heed Poor Richard's advice. Its insistence that the regulation at issue here is "[c]onsistent with the statutory requirements," Resp'ts' Br. 17, contravenes what it in fact did—i.e., promulgate a regulation that disregards a vital statutory requirement. In my view, the majority proceeds anachronistically, as though we were deciding whether Union Pacific has established that advanced notification information[1] warrants federal protection. The Fixing America's Surface Transportation (FAST) Act has already answered *whether* federal law should protect this information—the answer is yes—and delegated to the Secretary of the Department of Transportation (Secretary) simply *how* it should be protected. Because the Secretary, acting through the Pipeline and Hazardous Materials Safety Administration (PHMSA or Agency), has not established protections for advanced notification information as the statute requires, I would vacate the regulation's information-sharing provision and remand for promulgation of regulations that follow the FAST Act's command.

The FAST Act unambiguously commands the Secretary to protect the railroads' advanced notification information:

> [T]he Secretary, in consultation with appropriate Federal agencies, *shall* issue regulations that . . . establish security and

---

[1] The majority labels this information "aggregated." *See*, *e.g.*, Majority Op. 3 ("This case concerns . . . aggregated, county-by-county data."). I prefer the Congress's term, "advanced notification" information. Pub. L. No. 114-94, § 7302(a)(3), 129 Stat. 1312, 1595 (2015). "Aggregated" data in the majority opinion and "advanced notification" information in the FAST Act are one and the same.

confidentiality protections, including protections from the public release of proprietary information or security-sensitive information, to prevent the release to unauthorized persons [of] any electronic train consist information or advanced notification or information provided by Class I railroads under [§ 7302].

Pub. L. No. 114-94, § 7302(a)(6), 129 Stat. 1312, 1594–95 (2015) (emphasis added). The statutory text makes clear that *the Secretary*, not the states, must *establish*—that is, "bring about or into existence," *Establish*, BLACK'S LAW DICTIONARY (11th ed. 2019)—security protections for advanced notification information. Our sole task, therefore, is to decide whether the Agency complied with the Congress's mandate. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'") (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

In response to the FAST Act, PHMSA issued regulations implementing its information-sharing provisions (Rule) by delegating to Class I railroads the responsibility to "indicate" whether their statutorily-mandated disclosures "include[] information that a railroad believes is security sensitive or proprietary and exempt from public disclosure." 49 C.F.R. § 174.312(c)(3). Union Pacific contends that the Rule— invalidly—leaves the actual protection of such information to state open records and sunshine laws, as was the case before the FAST Act. *See* Resp'ts' Br. 18 ("The final rule thus provides a formal mechanism by which railroads can alert states when they believe that particular information should not be publicly disclosed. The states can then weigh the railroads'

assertion of confidentiality or privilege under state law and render a final determination about disclosure."). I agree.

To support the Rule, the Agency contrasts "highly sensitive" train consist information, which presumably warrants protection, with the "highly aggregated" advanced notification information it claims is at issue here. Resp'ts' Br. 16. The majority follows suit, labeling the FAST Act's treatment of the two information categories a "bifurcated scheme." Majority Op. 5. Although that may be correct regarding the railroads' reporting requirements, *cf.* § 7302(a)(1)–(2), (5), (7) (train consist information), *with* § 7302(a)(3)–(4) (advanced notification information), the distinctions made elsewhere in § 7302 underscore the Secretary's duty under § 7302(a)(6)—the only paragraph in the section that addresses *both* types of information—to establish security and confidentiality protections for advanced notification information as well as train consist information. Even if the FAST Act does not compel the Secretary to establish identical protections for both categories of information, her duty to establish *something* applies both to advanced notification information and to train consist information.

The majority declares that it does "not understand the agency, in tackling its obligation under § 7302(a)(6) . . . to have supposed that it could provide *no* protection for the aggregate data," Majority Op. 4, but that is precisely what PHMSA did in continuing to leave enforcement to the states. Indeed, PHMSA's position is that it—i.e., *the agency*—need not protect advanced notification information because it is adequately protected by state law. *See* Resp'ts' Br. 17 ("To ensure appropriate protection of any information *under state law* . . . the agency did direct railroads to identify information 'that a railroad believes is security sensitive or proprietary and

exempt from public disclosure' *under state law*.") (emphases added) (citation omitted)). The FAST Act's text states otherwise—not only did the Congress express its intent to federalize then-existing state protections, *see* § 7302(a) ("*[T]he Secretary*, in consultation with appropriate *Federal agencies*, shall issue" regulations.) (emphases added), but, if the Agency can satisfy § 7302(a)(6) by leaving in place, virtually untouched, the state enforcement status quo, the entire paragraph—or at least its reference to advanced notification information—is superfluous in that it can be totally ignored. But neither we nor the Secretary can disregard § 7302(a)(6)'s command that "the Secretary . . . shall . . . establish security and confidentiality protections" and that the statute applies to "advanced notification or information provided by Class I railroads under this section." *See Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."). The majority treats the Secretary's duty to establish protections as applying, at most, to train consist information *in futuro*, *see* Majority Op. 3 ("In a separate rulemaking not at issue here, the agency is addressing the more detailed train consist information."), and shrugs off the same mandate's application to advanced notification information.

The majority further declares that "[v]iewed as an [Administrative Procedure Act] arbitrary and capricious challenge, the claim requires the railroad to shoulder the burden of proof," meaning "Union Pacific must point to some evidence to substantiate its claim." Majority Op. 8 (citing *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) and *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009)). But the majority, I submit, misunderstands Union Pacific's claim. The claim it makes and

must substantiate is that PHMSA ignored the FAST Act's mandate to establish security and confidentiality protections for advanced notification information. I believe Union Pacific has so substantiated its claim and, accordingly, I would declare the Rule invalid as inconsistent with the FAST Act. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *see also In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress."). The majority defers to the Agency's "specific uncontradicted finding that requiring the railroad to flag the information to the state response commissions was 'sufficient to ensure confidentiality and security,'" Majority Op. 6 (citing 84 Fed. Reg. 6,910, 6,932), because "during the administrative proceedings Union Pacific provided not a mote of evidence that the type of data at issue here has been or even could be so exploited," *id.* at 7. But the Agency's finding is not one that can be "met" with evidence—the finding *itself* misreads the statute and the railroads therefore contest the finding not with contrary evidence but by relying on the statutory language that PHMSA disregarded.

Under the Rule, railroads "should indicate" whether their disclosures "include[] information that [they] believe[] is security sensitive or proprietary and exempt from public disclosure." 49 C.F.R. § 174.312(c)(3). The provision's force is unclear. The Agency delegates responsibility to protect such information to the railroads—it is unlikely that states will treat as confidential information not labeled as such—but well-settled precedent forecloses this path. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) (Williams, J.) ("[F]ederal agency officials . . . may not subdelegate to outside

entities—private or sovereign—absent affirmative evidence of authority to do so."); *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (delegation to "private persons whose interests may be and often are adverse to the interests of others in the same business" is "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body."). In fact, the Rule's ambiguous language renders it unenforceable as to all parties, both federal and state governments—on which it places no duty—and the railroads, which are informed only that they "should" indicate whether they "believe" information is confidential. 49 C.F.R. § 174.312(c)(3). Unenforceable guidance like this falls far short of the FAST Act's command that "[t]he Secretary . . . issue regulations that . . . establish security and confidentiality protections." Pub. L. No. 114-94, § 7302(a)(6).

The majority accepts the Agency's core argument that advanced notification information does not merit federal protection. *See* Resp'ts' Br. 19 ("The blanket requirement to establish security protections does not compel the agency to protect information without regard to whether its release would cause demonstrable harm or violate federal law."). I believe PHMSA's argument fails for at least three reasons. First, it fights yesterday's battle—whether release of advanced notification information "causes demonstrable harm" and therefore merits protection was resolved by the Congress when it enacted the FAST Act. Second, the Agency's circular conclusion that advanced notification information need not be protected because it does not "violate federal law" ignores that it is required to be protected by the FAST Act, which *is* a federal law. In other words, the Secretary's failure to comply with federal law—§ 7302(a)(6)—is the very reason advanced notification information is—again, invalidly—not protected by federal law today. Third, notwithstanding the majority emphasizes the fact that the FAST Act "weaves state

institutions into its program," its point about PHMSA's decision "to coordinate its action with aspects of state law," Majority Op. 6, is especially off key here, as § 7302(a)(6) in no way suggests that the Secretary's duty to establish security and confidentiality protections is to be shared with the states, much less left to them.

By upholding the Rule's information-sharing provision, the majority goes beyond deference and permits the Agency to ignore unambiguous statutory text. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 260 (1991) (Scalia, J., concurring in part and concurring in the judgment) ("[D]eference is not abdication, and it requires [courts] to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ.). The FAST Act unambiguously commands the Secretary to "establish" *something* and, as the majority observes, "something . . . beats nothing . . . every time." Majority Op. 8. I respectfully dissent.