# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 25, 2022        Decided July 15, 2022

No. 21-1049

TRANSPORTATION DIVISION OF THE INTERNATIONAL
ASSOCIATION OF SHEET METAL, AIR, RAIL AND
TRANSPORTATION WORKERS AND BROTHERHOOD OF
LOCOMOTIVE ENGINEERS AND TRAINMEN,
PETITIONERS

v.

FEDERAL RAILROAD ADMINISTRATION AND UNITED STATES
DEPARTMENT OF TRANSPORTATION,
RESPONDENTS

ASSOCIATION OF AMERICAN RAILROADS,
INTERVENOR

———

On Petition for Review of a Final Rule
of the Federal Railroad Administration

———

*Lawrence M. Mann* argued the cause for petitioners. With him on the briefs were *Kevin Brodar* and *Joshua D. McInerney*. *James Petroff* entered an appearance.

*Amanda L. Mundell*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were

*Brian M. Boynton*, Acting Assistant Attorney General at the time the brief was filed, *Abby C. Wright*, Attorney, *John E. Putnam*, Deputy General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel for Litigation and Enforcement, *Joy K. Park*, Senior Trial Attorney, *Allison Ishihara Fultz*, Chief Counsel*,* Federal Railroad Administration, and *Rebecca S. Behravesh*, Senior Attorney.

*Thomas H. Dupree Jr.* argued the cause for intervenor Association of American Railroads in support of respondent. With him on the brief was *Kathryn D. Kirmayer*.

Before: MILLETT, WILKINS, and JACKSON[*], *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In 2020, the Federal Railroad Administration ("Administration") issued a broad-ranging rule revising the regulations governing freight railroad safety. *See* Miscellaneous Amendments to Brake System Safety Standards and Codification of Waivers ("Final Rule"), 85 Fed. Reg. 80,544 (Dec. 11, 2020). Two unions representing employees of freight railroads—the Transportation Division of the International Association of Sheet Metal, Air, Rail, and Transportation Workers and the Brotherhood of Locomotive Engineers and Trainmen (together, "Unions")—have petitioned for review. The Unions principally argue that the Administration fell short in numerous respects in its statutory obligation to prioritize safety in regulatory decisionmaking. They also contend that the Administration impermissibly

---

[*] Circuit Judge, now Justice, Jackson was a member of the panel at the time the case was argued but did not participate in the opinion.

denied them an opportunity to seek reconsideration, and that the Final Rule was untimely issued.

We agree with the Unions that the portion of the Final Rule lifting calibration requirements for certain telemetry devices did not grapple with the Administration's safety obligation. But all their other challenges fail either on the merits or for lack of jurisdiction. As a result, we grant the petition in part, deny the petition in part, dismiss the petition in part, and remand part of the Final Rule.

**I**

**A**

Federal law charges the Administration with "prescrib[ing] regulations and issu[ing] orders for every area of railroad safety[.]" 49 U.S.C. § 20103(a); 49 C.F.R. § 1.89(a), (b). Congress has directed that, "[i]n carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in railroad transportation." 49 U.S.C. § 103(c).

To permit "industry stakeholders" to test "novel transportation technologies," Final Rule, 85 Fed. Reg. at 80,546, the Administration "may waive[] or suspend the requirement to comply with[] any part of a regulation" if doing so "is in the public interest and consistent with railroad safety[,]" 49 U.S.C. § 20103(d)(1); 49 C.F.R. § 1.89(a); *see also Brotherhood of Locomotive Eng'rs & Trainmen v. Federal R.R. Admin.*, 972 F.3d 83, 90 (D.C. Cir. 2020). The hope is that "[a]ctivity under a waiver of regulatory compliance may generate sufficient data and experience to support" its

codification into regulation. 85 Fed. Reg. at 80,546. In the Administration's view, "[c]odifying a waiver, and thereby making its exemptions and requirements universally applicable, allows the entire industry to benefit from the regulatory relief the waiver provides[.]" *Id.* Congress has recently endorsed this regulatory approach. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 22411, 135 Stat. 429, 742 (2021) (codified at 49 U.S.C. § 20103(d)(4)(A)) ("Not later than 1 year after the first day on which a waiver * * * has been in continuous effect for a 6-year period, the Secretary shall complete a review and analysis of such waiver * * * to determine whether issuing a rule that is consistent with the waiver is * * * (i) in the public interest; and (ii) consistent with railroad safety.").

**B**

In December 2020, the Administration issued new regulations that revised procedures for the testing, inspection, and operation of freight train brake systems. Final Rule, 85 Fed. Reg. 80,544.

To understand the regulations, some background is needed. Train brakes are controlled by compressed air. This air flows from the locomotive to each rail car through a brake pipe that runs the length of the train. To apply the brakes, a train's engineer uses the locomotive's brake valve to release air from the brake pipe. The consequent reduction in air pressure causes air stored in reservoirs in each car to enter the car's brake mechanisms, pressing the brake shoes against the wheels. To release the brakes, the engineer severs this connection by positioning the brake valve to feed air back into the brake pipe, stabilizing the brake pipe air pressure. *See generally* Amendments to Brake System Safety Standards Governing Operations Using an Electronic Air Brake Slip System

("Proposed Brake Amendments"), 86 Fed. Reg. 3,957, 3,959–3,960 (proposed Jan. 15, 2021); Railroad Power Brakes and Drawbars, 50 Fed. Reg. 35,640, 35,641 (Sept. 3, 1985).

The 2020 Final Rule made a panoply of changes to the Administration's brake system safety regulations. At issue in this case are the Final Rule's revisions to (i) brake testing and inspection requirements and (ii) the rules governing so-called end-of-train devices.

**1**

Railroad brake systems must, by law, be tested regularly. A comprehensive brake test, which is known as a Class I initial terminal inspection, is required when a train has been "off-air"—disconnected from a source of compressed air—for a specified period of time. 49 C.F.R. § 232.205(a)(3). The Final Rule increased from four to 24 hours the maximum permissible off-air time before a new Class I brake test is required. Final Rule, 85 Fed. Reg. at 80,553.[1]

Among other things, Class I tests measure the leakage of air from the brake pipe. 49 C.F.R. § 232.205(c)(1). In trains with multiple locomotives—so-called "distributed power trains"—each locomotive feeds air into the brake pipe. Proposed Brake Amendments, 86 Fed. Reg. at 3,960. Likewise, some trains contain air repeater units that do the same. 49 C.F.R. § 232.5.

---

[1] The Administration also increased to 24 hours the off-air periods that factor into the timing of other brake tests. *See* 49 C.F.R. § 232.209(a)(1) (Class II brake tests); *id.* § 232.211(a)(3)–(a)(5) (Class III brake tests); *id.* § 232.217(c)(1) (yard air brake tests).

For trains whose brake pipes are supplied by multiple sources, the Final Rule increased the maximum permissible "air flow"—a measure of brake pipe leakage quantifying the amount of air the brake valve must feed into the brake pipe to maintain proper pressure—from 60 to 90 cubic feet per minute. Final Rule, 85 Fed. Reg. at 80,554–80,555. Air flow is measured by a device called an air flow method indicator. 49 C.F.R. § 232.5.

Individual freight cars also undergo brake tests. The Final Rule prescribed that the brakes of freight cars on shop or repair tracks need not be tested if they have received an automated test within the previous 24 or 48 months (depending on the type of test used). 85 Fed. Reg. at 80,559.

The Administration took several other relevant actions concerning brake testing.

First, it declined to classify air repeater units and air flow method indicators as locomotive appurtenances subject to the same safety standards as locomotives themselves. 85 Fed. Reg. at 80,555–80,556 (air repeater units); *id.* at 80,557 (air flow method indicators).

Second, the Final Rule allowed the operators of extended haul trains, which are permitted to travel up to 1,500 miles between brake tests, to forgo reporting the type of equipment such trains haul and to designate alternative testing and inspection locations for them in emergencies. 85 Fed. Reg. at 80,557.

Third, the Final Rule reworked the regulations governing brake testing and inspections for tourist, scenic, historic, and excursion railroads, which generally use older, heritage rail cars and locomotives. 85 Fed. Reg. at 80,562–80,564.

**2**

The Final Rule also changed the regulation of end-of-train devices. An end-of-train device pneumatically seals the brake pipe. Proposed Brake Amendments, 86 Fed. Reg. at 3,959. Using radio telemetry, the device also communicates the air pressure level at the end of the brake pipe to the locomotive. *See* 49 C.F.R. § 232.403(b). The Final Rule eliminated a requirement that end-of-train devices' telemetry equipment be calibrated at least once every 368 days. 85 Fed. Reg. at 80,561.

Certain end-of-train devices serve an additional "critical" role in brake functioning. 85 Fed. Reg. at 80,551. In an emergency, the train crew can rapidly apply the train's brakes by directing the end-of-train device to vent air from the brake pipe. *See* 49 C.F.R. § 232.405(a)–(c). For this system to work, though, a radio connection must be maintained between the end-of-train device's rear unit, which is attached to the brake pipe, *see id.* § 232.403(b), and its front unit, which transmits commands from the locomotive, *see id.* §§ 232.403(f), 232.405(a); 85 Fed. Reg. at 80,551. Under current regulations, if a rear unit loses contact with its front unit for 16 minutes and 30 seconds, the front unit alerts the crew, which must reduce the train's speed until the radio connection is restored. 49 C.F.R. § 232.407(g). In the Final Rule, the Administration rejected proposals from the Unions and the National Transportation Safety Board to reduce that time period. 85 Fed. Reg. at 80,551.

End-of-train devices also contain a lamp that is visible to trains approaching from behind. *See* 49 C.F.R. § 221.13. The Final Rule decreased the minimum height at which these lights must be displayed from 48 inches above the top of the rail to

"above the [rail car's] coupler"—approximately 40 inches above the top of the rail.  85 Fed. Reg. at 80,550.

Additionally, the Final Rule codified a waiver providing that when certain railroad employees enter the tracks to change the battery of an end-of-train device, the train crew is not required under certain circumstances to institute "blue signal protection"—a protocol under which markers are used to alert other workers and nearby trains that a person is present on the tracks.  85 Fed. Reg. at 80,548–80,549.

Lastly, the Final Rule codified waivers exempting end-of-train devices using air-powered generators from certain battery life requirements applicable to other devices.  85 Fed. Reg. at 80,559–80,560.

\*     \*     \*

Because the Final Rule "reliev[ed] \* \* \* regulatory restrictions," the Administration "ma[d]e the rule effective upon publication."  85 Fed. Reg. at 80,544; *see* 5 U.S.C. § 553(d), (d)(1) ("The required publication \* \* \* of a substantive rule shall be made not less than 30 days before its effective date, except \* \* \* a substantive rule which grants or recognizes an exemption or relieves a restriction[.]").

The Unions timely petitioned for review, arguing that the Final Rule (i) disregarded the Administration's statutory mandate to prioritize safety, (ii) deprived them of an opportunity to seek reconsideration of the rule, and (iii) was untimely issued.

We have jurisdiction under 28 U.S.C. § 2342(7) and 49 U.S.C. § 20114(c).

9

**II**

**A**

We review the Administration's Final Rule using the well-established standards of the Administrative Procedure Act ("APA"). *Burlington N. Santa Fe Ry. Co. v. Department of Transp.*, 566 F.3d 200, 203 (D.C. Cir. 2009). "[T]he APA requires agencies to reasonably explain" the bases for their actions and conclusions, *Brotherhood of Locomotive Eng'rs & Trainmen*, 972 F.3d at 115, and it directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2), (2)(A). "A rule is arbitrary and capricious if an agency fails to consider a factor [it] must consider under its organic statute[.]" *Lindeen v. SEC*, 825 F.3d 646, 657 (D.C. Cir. 2016) (formatting modified and citation omitted).

Here, Congress has established—in no uncertain terms— a "statutory requirement to prioritize safety" in the regulatory process. *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Federal R.R. Admin.*, 10 F.4th 869, 876 (D.C. Cir. 2021). Recall that "[i]n carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in railroad transportation." 49 U.S.C. § 103(c).

An agency with such a "broad mandate" to "assign[], maintain[], and enhanc[e] safety * * * as the highest priorit[y]" must affirmatively consider and give substantial weight to any "plausible * * * safety concern[s]" a policy proposal implicates. *Flyers Rights Educ. Fund, Inc. v. Federal Aviation*

*Admin.*, 864 F.3d 738, 741, 744 (D.C. Cir. 2017) (citation omitted); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 60 (D.C. Cir. 2019) (an agency charged with regulating in an area that Congress has "deemed important to protecting public safety * * * must take into account its duty to protect the public") (citation omitted). Like all its "findings[] and conclusions[,]" 5 U.S.C. § 706(2), the Administration's safety determinations must be "support[ed]" by the record and "reasonably explained[,]" *Transportation Div.*, 10 F.4th at 876.

**B**

The record before us shows that the Administration acted "consistent[ly] with consideration of 'safety as the highest priority[,]'" *Transportation Div.*, 10 F.4th at 876 (quoting 49 U.S.C. § 103(c)), in all respects but one involving the calibration of older-generation end-of-train devices.

**1**

The Unions raise several safety objections to the Final Rule's provisions governing brake testing and inspection for trains and rail cars. None of these claims succeeds.

**a**

The Unions first claim that the Administration's decision to increase the maximum permissible off-air period from four to 24 hours violates its safety mandate. They are mistaken. The Administration took careful account of the safety implications of this change, and reasonably concluded that increasing the off-air period would not pose a safety risk in light of "technological improvements to the air brake systems[.]" Final Rule, 85 Fed. Reg. at 80,553.

The Administration grounded its judgment on a comparison of brake safety records in the United States and Canada, where the maximum off-air period was already 24 hours. That study "show[ed] fewer undesired and unintended emergency brake applications occurring in Canada than in the U.S." 85 Fed. Reg. at 80,553. Buttressing that conclusion was a study from the Association of American Railroads' Transportation Technology Center testing a 24-hour off-air period and finding no adverse safety consequences. *Id.*

The Unions do not directly question this data or the Administration's conclusion that extending the off-air period to 24 hours would not adversely affect safety. Instead, they take issue with, among other things, the Administration's "expect[ation]" that decreasing the frequency of tests would reduce workplace injuries such as "slips, trips, and falls" by those conducting the brake tests. 85 Fed. Reg. at 80,553. Specifically, the Unions fault the Administration's failure to quantify this reduction and its lack of "reliable supporting data." Unions Opening Br. 13.

Neither objection holds up. The Administration relied on data supplied by the Association of American Railroads "quantifying slips, trips, and falls incurred[,]" 85 Fed. Reg. at 80,553, by workers "bending or stooping" over, "stepping on[,]" and "walking" on train tracks while on the job, J.A. 276–277 (Association of American Railroads' data report). The Administration reasonably found this data reliable because it was initially "submitted by [the Unions'] own constituents to their employing railroads[,]" and in turn to the Administration's accident database. 85 Fed. Reg. at 80,553. Consequently, the Administration considered the data "to be of the type the agency routinely relies upon to inform its rulemakings[.]" *Id.* From that information, the Administration made a "reasonable predictive judgment based on the

evidence" before it that fewer brake tests—and hence fewer occasions for workers to be on the tracks—would lead to fewer injuries. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021).

The Unions worry that this rationale, if taken to its logical conclusion, would justify "doing away with inspections altogether." Unions Opening Br. 14. We need not go down that slippery slope. Here, the Administration had persuasive evidence before it that lengthening the off-air time would *both* reduce risks to workers and maintain a high level of railway safety. Nothing in the Administration's rulemaking or our decision forecloses a different balance from occasioning a different outcome.

The Unions also allude to a prior rulemaking in which the Administration surmised that a lengthy off-air period might pose safety problems in areas where vandalism is common. The Administration directly responded to that point by explaining that (i) the Unions did "not submit[] any data to support [their] concerns[,]" (ii) "no other commenters provided any information on vandalism[,]" and (iii) its own "accident database contains no information indicating that vandalism of air brakes has had any significant relationship to air brake–caused accidents." 85 Fed. Reg. at 80,553.

The Unions next offer a grab bag of meritless objections to the Administration's decisional process. Their concern that the off-air period change was made in response to the Association of American Railroads' rulemaking petition is beside the point as the Administration is authorized to act in response to a rulemaking petition. *See* 49 C.F.R. §§ 211.7, 211.9; *see also* 5 U.S.C. § 553(e) ("Each agency shall give an interested person the right to petition for the issuance * * * of a rule."). Their complaint that the Administration relied on

"old data * * * which had already been rejected[,]" Unions Opening Br. 16, overlooks that the Final Rule relied heavily on newly submitted safety data from freight rail operations in Canada under a 24-hour off-air rule. Finally, their assertion that the Administration was concerned only with "the economic interests of the railroad[,]" Unions Opening Br. 16 (citation omitted), blinks away the Administration's affirmative safety findings.

**b**

The Unions challenge the Administration's decision to increase the maximum permissible combined brake pipe leakage—defined in terms of air flow—from 60 to 90 cubic feet per minute ("CFM") on distributed power trains and trains with air repeater units. They contend that this change will allow brake pipes to leak more than the "long-standing" limit of five pounds per square inch per minute. Unions Opening Br. 17; *see* 49 C.F.R. § 232.205(c)(1) ("Brake pipe leakage shall not exceed 5 [pounds per square inch] per minute or air flow shall not exceed 60 * * * CFM[].").

The Administration, though, reasonably found that the leakage limit could safely be raised. It noted that "since 2011, Canadian railroads ha[d] operated with the higher air flow limit[,]" and "railroads in the U.S. ha[d] tested and operated with air flow limits of 90 CFM" on distributed power trains under a seven-year waiver, essentially without incident. 85 Fed. Reg. at 80,555. The Unions do not dispute the reliability of this evidence or its direct relevance here.

The Administration also soundly laid out the technical basis for its judgment: "Because use of [distributed power] locomotives and [air repeater units] provide[s] multiple sources of air, the total leakage from the brake pipe can be greater than

60 CFM, as long as each individual source of air is controlling a portion of the brake pipe that leaks less than 60 CFM," as required by 49 C.F.R. § 232.205(c)(1). 85 Fed. Reg. at 80,554–80,555; *see also* 49 C.F.R. § 232.205(c)(1)(ii)(B) ("A train equipped with at least one distributed power unit or an air repeater unit providing a source of brake pipe control air from two or more locations must not exceed a *combined* flow of 90 cubic feet per minute[.]") (emphasis added). The Unions have no answer to that logic.

**c**

The Unions also challenge as unsafe the Administration's decision to allow a 24- or 48-month interval between brake tests of individual rail cars if those tests are conducted with automated devices. The Administration reasonably concluded otherwise.

The Administration grounded its judgment on both real-world test results obtained during a seven-year waiver that allowed certain railroads to perform automated tests on rail cars every 24 months, and on the ability of automated testing devices to "provide a more comprehensive testing of the braking system[.]" 85 Fed. Reg. at 80,558–80,559.

The Unions, for their part, have never questioned the accuracy of the data gathered under the waiver. *See* Unions Comment 7, J.A. 365 ("[T]he data speaks for itself[.]"). Neither do they dispute the effectiveness of the more modern automated devices. Nor have they offered any other reason to think that the Administration's testing intervals pose a safety concern. *See Union Pac. R.R. Co. v. Pipeline & Hazardous Materials Safety Admin.*, 953 F.3d 86, 90 (D.C. Cir. 2020) (A petitioner "must point to some evidence to substantiate its claim."); Unions Comment 7–8, J.A. 365–366. And as long as

the rule ensures safety—which the record supports—any "windfall" the Final Rule might also grant to the railroads is neither here nor there. Unions Opening Br. 26.[2]

The Unions broadly object to the Administration's decision to codify waivers without retaining certain oversight measures such as "recordkeeping and transparency requirements[,]" and "a testing committee[.]" Unions Opening Br. at 17, 25. But because the Unions did not raise these objections during the rulemaking, *see* Unions Comment 1–10, J.A. 359–368, they are forfeited, *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005).

**d**

The Unions argue that the Administration erred by declining to classify air repeater units and air flow method indicators as locomotive appurtenances. A locomotive appurtenance is "an integral or essential part of a completed locomotive[.]" *Southern Ry. Co. v. Lunsford*, 297 U.S. 398, 402 (1936); *accord Straub v. Burlington N. Santa Fe Ry. Co.*, 909 F.3d 1280, 1288 n.9 (10th Cir. 2018). By statute and regulation, a "locomotive * * * and its parts and appurtenances" must be "in proper condition and safe to operate without unnecessary danger of personal injury[,]" 49

---

[2] We note that the Unions did not object to the automated test interval in their comment, *see* Unions Comment 7–8, J.A. 365–366, although another labor organization did, 85 Fed. Reg. at 80,559. For that reason, we treat the issue as not forfeited. *See Natural Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (en banc) ("[C]ourts have waived exhaustion if the agency has had an opportunity to consider the identical issues * * * raised by other parties[.]") (internal quotation marks and citation omitted).

16

U.S.C. § 20701, (1); *accord* 49 C.F.R. § 229.7(a), (a)(1), and so are subject to rigorous safety requirements, *see generally* 49 C.F.R. Part 229.

In the Final Rule, the Administration concluded that air flow method indicators used to measure brake pipe leakage are not locomotive appurtenances because their use is "optional[,]" and thus "unnecessary for a locomotive to be in proper condition and safe to operate." 85 Fed. Reg. at 80,557 (internal quotation marks omitted). And the Administration declined to classify air repeater units that feed additional air into the train's brake pipe as locomotive appurtenances because they are more "akin to" end-of-train devices that "receive[] commands but [are] not a component of a locomotive." *Id.* at 80,555–80,556. The Administration also pointed out that the use of air repeater units, like air flow method indicators, is "optional[.]" *Id.* at 80,555. This was a textually rooted and logically sound explanation.

The Unions maintain that the Administration "simply ignored" their comment that air repeater units should be subjected to the same inspection standards as locomotives. Unions Opening Br. 28. That is incorrect. The Administration observed that an air repeater units "share[] features with both locomotives and freight cars," and so decided that while the units themselves are not locomotive appurtenances, their "components that are similar to * * * locomotive [appurtenances]," such as those that "compress air, modulate the brake pipe, or otherwise control the train's movement[,]" "must be inspected in accordance" with the standards governing locomotives. 85 Fed. Reg. at 80,556.

**e**

The Final Rule revised two rules governing extended haul trains—that is, trains that may travel up to 1,500 miles between brake tests and inspections. 85 Fed. Reg. at 80,557. First, the Final Rule lifted the requirement that operators disclose what equipment those trains haul. *Id.* Second, it gave railroads flexibility to designate different inspection and test locations in emergencies. *Id.* The Administration explained that (i) there was no safety reason to require operators to report the equipment in extended haul trains, and (ii) permitting railroads to designate new inspection and test locations in emergencies promotes "flexib[ility]" and "regulatory certainty," while maintaining the status quo "would provide no safety benefit." *Id*.

The Unions contend that those changes arbitrarily made "oversight more difficult." Unions Opening Br. 28. But they forfeited this objection by failing to raise it before the agency. *Advocates for Highway & Auto Safety*, 429 F.3d at 1150; *see* Unions Comment 6–7, J.A. 364–365.

**f**

Finally, the Unions object to certain changes the Administration made to the rules governing brake tests for tourist, scenic, historic, and excursion railroads. We lack jurisdiction to hear this challenge because the Unions have not established their standing to raise it.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "'irreducible constitutional minimum' of standing consists of three elements": injury in fact, causation, and redressability.

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560). A union "assert[ing] associational standing on behalf of its members" must demonstrate that "at least one [u]nion member meets all three requirements for individual standing." *Utility Workers Union of America Loc. 464 v. FERC*, 896 F.3d 573, 577 (D.C. Cir. 2018). When petitioning for review of agency action, the petitioner "must either identify in th[e] record evidence sufficient to support its standing" or "submit additional evidence to the court of appeals." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).

Here, the Unions have failed to demonstrate that any of their members were injured by the Administration's changes to the brake test rules for tourist, scenic, historic, and excursion railroads. They have neither identified record evidence nor submitted new evidence to this court showing that they have members who work on these railroads. Quite the opposite, at oral argument, the Unions conceded that it was "probably accurate" that they lacked standing "[a]s to the tourist railroads[.]" Oral Arg. Tr. 11:5–6. To be sure, the Unions assert in their reply brief that their members work on these railroads. *See* Unions Reply Br. 7. But such a "bare assertion[]" is insufficient to demonstrate standing to obtain relief through a petition for review. *Utility Workers*, 896 F.3d at 578.[3]

---

[3] For this same reason, counsel's statement at argument that Union members work on "short-line railroads," Oral Arg. Tr. 11:1–2, is too little too late to demonstrate standing, even assuming such railroads are affected by the regulatory changes for tourist, scenic, historic, and excursion railroads.

**2**

Next, the Unions challenge parts of the Final Rule related to end-of-train devices, with a bit more success.

**a**

The Unions object to the Administration's decision to no longer cap the time interval between calibration tests performed on end-of-train devices' telemetry equipment, and "instead to require telemetry equipment be tested and calibrated in accordance with its manufacturer's specifications and procedures[.]" 85 Fed. Reg. at 80,561. Specifically, the Unions argue that the Administration fell short of its safety mandate by eliminating the calibration interval not only for end-of-train devices with automatic self-calibration technology, but also for older, legacy devices without such capabilities.

We agree that the Administration acted arbitrarily and capriciously by failing to address the safety consequences of its decision for end-of-train devices that lack self-calibration technology.

End-of-train devices "must be tested in some fashion to verify that they are operating within the manufacturer's specification with regard to radio frequency, signal strength, and modulation and do not require recalibration." Brake System Safety Standards for Freight and Other Non-Passenger Trains and Equipment, 66 Fed. Reg. 4,104, 4,184 (Jan. 17, 2001). After all, reliable "radio communication between the controlling locomotive and the [end-of-train] device is critical to proper brake functioning." Final Rule, 85 Fed. Reg. at 80,551.

In the face of the safety concern posed by telemetry equipment in need of calibration, the Administration made no express findings at all regarding the safety of its regulatory change as applied to legacy devices, even though its prior calibration rule had "attained" and maintained a high "level of safety[.]" 85 Fed. Reg. at 80,561. Yet "[w]hen Congress requires an agency to consider something, we ask whether the agency has reached an express and considered conclusion pursuant to the statutory mandate." *Cigar Ass'n of America v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (internal quotation marks and citation omitted). The Administration failed to give safety any apparent consideration at all in this part of the Final Rule, let alone afford safety the "highest priority," as the law requires. 49 U.S.C. § 103(c).

To be sure, the Administration concluded that self-calibrating devices, in light of their advanced technology and record of success under a waiver from the calibration interval, "ensure[] better overall safety" than human calibration. 85 Fed. Reg. at 80,561. But the Administration made no similar findings for non-self-calibrating end-of-train devices, which is equally affected by its rule change. *See id.*

The Administration offered three reasons for its decision, none of which is sufficient to show it prioritized safety.

First, the Administration said that it "d[id] not expect manufacturers to change [calibration] intervals significantly" for legacy devices. 85 Fed. Reg. at 80,561. Maybe. But that fails to explain how abandoning a calibration requirement that had achieved a high "level of safety[,]" *id.*, continues to ensure safe railroad operations.

Second, the Administration noted that manufacturers must "submit an annual report to [the Administration] on inoperative

or malfunctioning equipment." Admin. Br. 15; *see also* 85 Fed. Reg. at 80,561; 49 C.F.R. § 232.409(f)(2). While reporting safety problems after they arise may help reduce them going forward, it does nothing to prevent them in the first place.

Third, the Administration observed that "the number of legacy devices * * * is consistently dwindling over time." Oral Arg. Tr. 15:13–15; *see also* 85 Fed. Reg. at 80,561 (describing end-of-train devices without self-calibration capabilities as "a technology the industry no longer produces"). That may be true. But thousands of these devices remain in operation, which means there are thousands of potential safety risks on the rails. *See* Oral Arg. Tr. 15:17–16:4.

Nothing in the Administration's explanation amounts to an "express and considered conclusion" regarding this safety issue, let alone a reasonable one. *Cigar Ass'n of America*, 964 F.3d at 61 (citation omitted). And the Administration offered no other explanation for how jettisoning a safety rule in favor of manufacturers' self-regulation promotes safe rail operations. On the contrary, the Administration touted "the level of safety attained with calibrations performed at least every 368[ ]days"—that is, the safety achieved under its abandoned rule. 85 Fed. Reg. at 80,561.

Because the Administration failed to "reasonably address" the safety concerns implicated by its decision to eliminate the calibration interval for legacy telemetry equipment, *see Flyers Rights Educ. Fund*, 864 F.3d at 744, it did not act "consistent[ly] with consideration of 'safety as the highest priority[,]'" *Transportation Div.*, 10 F.4th at 876 (quoting 49 U.S.C. § 103(c)). So we remand this portion of the Final Rule to the Administration to address the safety consequences of its rule change for non-self-calibrating end-of-train devices.

22

**b**

The Unions next object to the Administration's decision not to shorten the amount of time an end-of-train device's rear unit can be out of communication with its front unit before the device triggers an alert to the crew to reduce the train's speed. We find no error in the Administration's decision not to make such a change.

At the Administration's request, the National Transportation Safety Board and the Unions submitted proposals to shorten the length of a communication loss between the end-of-train device and the locomotive necessary to alert the crew. 85 Fed. Reg. at 80,551. The Administration, however, declined to adopt these proposals. *Id.* It instead imposed additional training requirements "to ensure that employees who operate [end-of-train] equipment are trained in the limitations and proper use of the equipment's emergency application signal and loss of communications indicator." *Id.* Although the Administration "agree[d] in principle with the desire * * * to minimize the potential impact of communications losses[,]" the "thousands of telemetry systems in use throughout the railroad industry" meant "the costs of requiring * * * a change" of the sort proposed by the Board and the Unions "would be significant[,]" and, on the other side of the ledger, the Administration "d[id] not currently have sufficient data to determine the likely resulting benefits." *Id.* The Administration concluded that, "because the potential impacts" of the proposals were "not yet understood[,]" it would be "premature" to adopt them. *Id.*

The Administration reasonably elected to hold off on changing the rule in the absence of adequate information to properly assess the safety benefits and disadvantages of doing so. The Unions' argument that the Administration

"abdicat[ed]" its safety duty just assumes that the Board's and the Unions' proposals would, in fact, promote safety—a conclusion the Unions failed to substantiate, and the Administration was not able to reach on the record before it. Unions Opening Br. 29.

**c**

The Unions also assert that the Administration failed to respond to a comment they made regarding the agency's decision to decrease the minimum height of marker lamps on end-of-train devices from 48 inches above the top of the rail to "above the coupler," approximately 40 inches above the top of the rail. 85 Fed. Reg. at 80,550. The Unions are mistaken.

Agencies must "respond[] to significant points raised by the public" during rulemaking. *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) (per curiam) (footnote omitted); *accord Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 345 (D.C. Cir. 2019). In their comment, the Unions proposed that marker lamps be visible from 1.5 miles away, given the distance long freight trains require to come to a stop.[4]

The Administration acknowledged and responded to the Unions' concern. It said that "[b]ased on * * * testing, the data developed through * * * waivers, and [its] experience, * * * on flat, tangent track, [end-of-train] marker lights at 48 inches and 40 inches are visible from 1.5 miles away." 85 Fed. Reg. at 80,549. It then acknowledged that "there can * * * be some vertical undulation in the track or curves that could reduce the

---

[4] An agency need only respond to comments "that can be thought to challenge a fundamental premise underlying the proposed * * * decision." *Carlson*, 938 F.3d at 344 (internal quotation marks and citation omitted). We assume for argument's sake that the Unions' comment required a response.

visibility below 1.5 miles." *Id.* Nevertheless, based on five years of operations under waivers, the Administration found "no discernable visibility difference" for marker lamps at lower heights, adding that "no accidents attributed to the lowered marker lamp height * * * have been reported through the [agency's] accident reporting system." *Id.*

That was an adequate response. Beyond that, the Unions have affirmatively waived any substantive challenge to the marker lamp height because, in their comment, they said they had "no quarrel" with the agency's proposal. Unions Comment 3, J.A. 361.

**d**

Next, the Unions object on safety grounds to the Administration's inclusion of battery changes for end-of-train devices on the list of functions that certain railroad workers can perform without blue signal protection.

The Administration, however, reasonably concluded that this change would be consistent with safety because it "incorporates two longstanding waivers granted * * * over a decade ago and under which each Class I railroad has operated successfully, with no reports of related injuries or incidents." 85 Fed. Reg. at 80,549.

The Unions maintain that the Administration "summarily and arbitrarily" dismissed their argument that a worker replacing an end-of-train device's battery without blue signal protection might face risk from another moving train. Unions Opening Br. 21. But, as the Administration explained, the Unions offered no reason "why the alleged risk associated with a utility employee replacing an [end-of-train] device's battery is any different from the risks associated with a utility

employee performing any of the * * * functions" already exempted by regulation from blue signal protection. 85 Fed. Reg. at 80,548. That sufficed.

**e**

Finally, the Unions argue that the Administration's codification of waivers regarding power sources for end-of-train devices was "so slipshod as to be arbitrary and capricious" because, they say, the Final Rule contains certain incorrect citations, and a comment by one of the Unions opposing one of the waivers does not appear online. Unions Opening Br. 19–20.

That argument is meritless. Such purported technical missteps have no logical connection to the consideration of on-the-ground safety that the statute mandates.

**III**

The Unions claim that the entire rule must be set aside because, in their view, the Administration improperly denied them an opportunity to petition for reconsideration of the Final Rule. Even assuming an error occurred, it was harmless.

In general, a petition for reconsideration of an Administration rule "must be submitted not later than 60 days after publication of the rule in the Federal Register, or 10 days prior to the effective date of the rule, whichever is the earlier." 49 C.F.R. § 211.29(a). But because the Administration made the Final Rule effective immediately upon publication, 85 Fed. Reg. at 80,544, it was impossible for the Unions to file a timely petition.

The Administration responds that the Unions could have filed an untimely reconsideration petition, which the Administration could have allowed if "good cause [were] shown," 49 C.F.R. § 211.29(a), and it suggests that "impossibility of compliance" with the deadline would furnish good cause. Admin. Br. 44.

Because the Unions have not shown that they were prejudiced in any way by not being able to seek timely reconsideration, we need not resolve either whether the Unions could have filed an untimely petition for reconsideration or whether the Administration erred in denying them an opportunity to petition.

The APA instructs courts to take "due account * * * of the rule of prejudicial error." 5 U.S.C. § 706; *see also PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). So we will not set aside agency action "based on procedural error unless the errors alleged could have affected the outcome." *Zevallos v. Obama*, 793 F.3d 106, 115 (D.C. Cir. 2015). "The burden to demonstrate prejudicial error is on the party challenging agency action." *Jicarilla Apache Nation v. Department of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010).

The Unions have failed to show any harm from this supposed agency misstep. They submitted a lengthy comment on the proposed rule that the Administration fully considered. Their briefs identify no "additional [argument] that they would have made" on rehearing that they did not or could not have included in their comments. *United States Telecom Ass'n v. FCC*, 400 F.3d 29, 41 (D.C. Cir. 2005). Nor do they argue that "repeating the comments [they] made" would have changed the outcome. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 192 (D.C. Cir. 2011) (per curiam). Because the Unions have not shown that the filing of a reconsideration petition would have

changed anything, any procedural error was harmless and vacatur is unwarranted.

**IV**

Lastly, the Unions claim that the Final Rule must be vacated because it was issued after the statutory deadline. Not at all.

Because the statute provides that "[t]he time limit for disposition of a proceeding" to regulate railroad safety "may not be more than 12 months after the date it begins[,]" 49 U.S.C. § 20103(b), the Administration must complete "rulemaking proceedings" within a year, 49 C.F.R. § 211.13. For rulemaking proceedings "initiated as the result of the granting of a rulemaking petition," the clock starts when "the petition [is] filed[.]" *Id.* Proceedings in this matter began when the Association of American Railroads filed its rulemaking petition on July 12, 2018. The Final Rule, which granted that petition, issued on December 11, 2020—more than two years later.[5]

We recently held, however, that "[m]issing this procedural deadline * * * does not require vacating the rule." *Transportation Div.*, 10 F.4th at 873. That is because,

---

[5] The Administration suggests the Final Rule was timely. It observes that its deadline is "12 months after the petition was filed" only for actions "initiated as the result of the granting of a rulemaking petition[.]" 49 C.F.R. § 211.13. In its view, this provision does not apply here because "the rulemaking was not initiated solely because of [the Association's] petition[,]" Admin. Br. 45–46, and so the deadline instead was 12 months after notice of the proceeding was published in the Federal Register, 49 C.F.R. § 211.13, which it met. We do not address this argument because even if the Final Rule was untimely issued, that is not grounds for vacatur.

"[a]lthough the Act uses language suggesting the deadline is mandatory[,]" *id.* at 874, "the Supreme Court has declined to treat a statutory direction that an agency shall act within a specified time, without more, as a jurisdictional limit precluding action later" by the agency, *National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 154 (D.C. Cir. 2010) (internal quotation marks omitted) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003)). Here, the "statutory language" and "the relevant context" neither "specify the consequences for missing a deadline" nor otherwise "suggest[] that vacatur should be the remedy for the agency's failure to wrap up a regulatory action within twelve months." *Transportation Div.*, 10 F.4th at 874 (internal quotation marks omitted) (quoting *Dolan v. United States*, 560 U.S. 605, 610 (2010)). In such a situation, "the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart*, 537 U.S. at 159 (citation omitted). The Unions have not identified any basis for departing from that rule here.

We nonetheless repeat what we said in *Transportation Division*: "When Congress provides * * * a short period for rulemaking, it indicates that the agency should move with dispatch." 10 F.4th at 874. If the agency fails to do so, the proper remedy is for an aggrieved party to seek a court order "compel[ling] agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

**V**

The petition for review is granted in part, denied in part, and dismissed in part. The Final Rule is remanded in part to the Federal Railroad Administration.

*So ordered.*