# United States Court of Appeals for the Federal Circuit

---

**HUGH CAMPBELL MCKINNEY,**
*Petitioner*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

2023-1930

---

Petition for review pursuant to 38 U.S.C. Section 502.

---

Decided:  January 14, 2026

---

SETH A. WATKINS, Watkins Law & Advocacy, PLLC, Washington, DC, argued for petitioner.

DANIEL FALKNOR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by ELIZABETH MARIE HOSFORD, PATRICIA M. MCCARTHY, YAAKOV ROTH; EVAN SCOTT GRANT, Y. KEN LEE, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

---

Before PROST, REYNA, and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*.

Hugh Campbell McKinney petitioned the United States Department of Veterans Affairs (VA's) to institute rulemaking to expand coverage of the Traumatic Servicemembers' Group Life Insurance (TSGLI) to include illness or disease caused by explosive ordnance. *See* Servicemembers' Group Life Insurance Traumatic Injury Protection Program, 88 Fed. Reg. 15,907 (Mar. 15, 2023) (*Final Denial*). TSGLI covers servicemembers who suffer a traumatic injury and is designed to fill a gap between the time the injury occurs and when other benefits are available. This program is overseen by the VA, which also has the power to issue regulations enumerating various injuries that are covered. As it stands, the regulation covers physical damage to a servicemember caused by, among other things, application of external force or chemical, biological, or radiological weapons. The regulation, however, does not cover an illness or disease, with a few exceptions. The VA denied Mr. McKinney's petition to expand coverage due to several concerns, including that such coverage would be inconsistent with the types of injuries the TSGLI was designed to protect. Mr. McKinney now petitions this court under 38 U.S.C. § 502 to set aside the VA's denial. For the following reasons, we *deny* the petition.

BACKGROUND

I

On May 11, 2005, the President signed into law the legislation establishing TSGLI to provide financial assistance to servicemembers who suffer severe traumatic injuries. J.A. 83. The purpose of the program is to address a "gap" in benefits identified by Congress: the period immediately after a service member suffers a traumatic injury when "the need for additional financial resources becomes most acute." J.A. 17–18. TSGLI provides that "[a] member of the uniformed service who is insured under Servicemembers' Group Life Insurance shall automatically be insured

for traumatic injury in accordance with this section" and that "[i]nsurance benefits under this section shall be payable if the member, while so insured, sustains a traumatic injury . . . that results in a qualifying loss."   38 U.S.C. § 1980A(a)(1).  The benefit, however, is payable only if the loss "results directly from [the] traumatic injury . . . and from no other cause."  *Id.* § 1980A(c)(1).

Under the statute, a qualifying loss includes loss of limbs; total and permanent loss of sight, hearing, or speech; severe burns; paralysis; traumatic brain injury; and loss of ability to carry out the activities of daily living.  S*ee id.* § 1980A(b)(1)(A–H).  Additionally, the VA may prescribe additional qualifying losses by regulation.  *Id.* § 1980A(b)(3).  The VA defined these qualifying losses in 38 C.F.R. § 9.20.[1]

According to 38 C.F.R. § 9.20, service members who experience (1) a traumatic event that results in (2) a traumatic injury directly causing (3) a qualifying "scheduled loss" are eligible to receive a TSGLI payment.  The VA defined "traumatic event" as the application of external force, violence, chemical, biological, or radiological weapons, or accidental ingestion of a contaminated substance causing damage to a living body.  38 C.F.R. § 9.20(b)(1).  Moreover, the VA defined "traumatic injury" as "physical damage to a living body that is caused by a traumatic event, as defined in [§ 9.20(b)]."  *Id.* § 9.20(c)(1).  However, "the term 'traumatic injury' *does not include* damage to a living body caused by," inter alia, "physical illness or disease, *except* if the physical illness or disease is caused by a pyogenic infection, biological, chemical, or radiological weapons, or accidental ingestion of a contaminated substance."  *Id.* § 9.20(c)(2) (emphasis added).  The regulation thus draws

---

[1]    In 2023, the VA modified 38 C.F.R. § 9.20 to expand the definition of a "traumatic event."  However, we will only be discussing the pre-2023 version of 38 C.F.R. § 9.20.

a distinction, for the most part, between physical damage caused by a traumatic injury and damage caused by an illness or disease for TSGLI benefits purposes.

To be eligible for payment of benefits, service members must suffer a scheduled loss "within two years of the traumatic injury." *Id.* § 9.20(d)(4). Additionally, the scheduled loss must "result[] *directly from* a traumatic injury and no other cause." *Id.* § 9.20(d)(2) (emphasis added). This means that "if a pre-existing illness, condition, or disease or a post-service injury substantially contributed to the loss," then the scheduled loss "does not result directly from a traumatic injury." *Id.* § 9.20(d)(2)(i).

The VA explained that illness and disease were generally excluded from the definition of "traumatic injury" because "the term 'injury' refers to the results of an external trauma rather than a degenerative process." Traumatic Injury Protection Rider To Servicemembers' Group Life Insurance, 70 Fed. Reg. 75940, 75941 (Dec. 22, 2005), J.A. 24. The VA, however, carved out five exceptions for "physical illness or disease caused by a pyogenic infection, chemical, biological, or radiological weapons, or accidental ingestion of a contaminated substance because including *immediate traumatic harm* due to those unique hazards of military service is consistent with the purpose of TSGLI." *Id.* (emphasis added). Thus, the VA specified that diseases resulting from those hazards are within the definition of "traumatic injury." *See* 38 C.F.R. § 9.20(c)(2)(ii).

II

Mr. McKinney is an Iraq war veteran who sustained a traumatic brain injury (TBI) from the concussive force of an improvised explosive device (IED) while deployed in 2005. Within two years of his TBI, Mr. McKinney suffered a stroke and submitted a claim for TSGLI benefits based on his stroke. Mr. McKinney's application was denied because the United States Army determined that

Mr. McKinney's stroke was a physical illness or disease rather than a qualifying traumatic injury under 38 U.S.C. § 1980A(a)(1).

In March 2015, Mr. McKinney filed a petition for rulemaking, requesting the VA to, among other things, broaden the definition of "traumatic injury" in 38 C.F.R. § 9.20. *See* Petition for Rulemaking by Army First Sergeant Hugh Campbell McKinney, Retired, to Amend 38 C.F.R. § 9.20 Governing Traumatic Injury Protection (U.S. Dep't of Veterans Affs. Mar. 16, 2015) (*Petition for Rulemaking*); J.A. 935. Mr. McKinney's proposed amendment would expand "traumatic injury" to also cover damage to a living body resulting from any physical illness or disease *caused by* explosive ordnance. J.A. 938–39. Under this proposed amendment, the explosive ordnance caused Mr. McKinney's TBI, which triggered a disease process that eventually led to Mr. McKinney's stroke.[2] Accordingly, Mr. McKinney's stroke would also be covered by TSGLI.

Mr. McKinney asserted that there is no meaningful difference between physical illness or disease that is linked to explosive ordnance and the types of physical illness or disease already covered by the VA's regulation, i.e., illnesses or diseases caused by pyogenic infection, biological, chemical, or radiological weapons, and accidental ingestion of a contaminated substance. In Mr. McKinney's view, explosive ordnances such as IEDs "produce immediate harm" which then follows a "disease process" similar to the five

---

[2]    Since both parties discuss only TBIs caused by explosive ordnance, *see, e.g.*, Pet'r's Br. 15; Resp't's Br. 15, we will use "TBI" interchangeably with "TBI caused by explosive ordnance" when discussing the causal connection between explosive ordnance, TBI, and the downstream physical illness or disease.

already-covered exceptions. *See Petition for Rulemaking* at 1–2 , J.A. 937–38.

The VA denied Mr. McKinney's petition on August 6, 2015. J.A. 973–75. However, as part of a ten-year anniversary review (Year-Ten Review) of the TSGLI program, the VA committed to (1) "analyze the relationship" between IED explosions and physical illness or disease development and (2) "conduct an actuarial assessment of any such regulatory amendment on the TSGLI program." *Id.* at 974. Mr. McKinney petitioned our court for review on October 5, 2015, and the VA rescinded its denial of Mr. McKinney's petition on December 1, 2015. The VA informed Mr. McKinney that it would not make a decision on the regulatory changes requested in his petition until it completed its Year-Ten Review of the TSGLI program. We subsequently granted Mr. McKinney's unopposed motion to dismiss his petition for review and noted that Mr. McKinney planned to refile a petition for review once the VA completed the Year-Ten Review and took final action on his rulemaking petition.

Although the VA completed its Year-Ten Review in 2018, it did not take any action on Mr. McKinney's rulemaking petition in the accompanying report. Instead, the VA stated that it would "respond to [Mr. McKinney's] petition during the formal regulatory submission process for the TSGLI Year-Ten Review recommendations." J.A. 1369. As part of this process, the VA consulted with numerous medical experts, the majority of whom opined that it is nearly impossible to prove a causal relationship between exposure to an explosive ordnance and a specific, subsequent illness or disease such as a stroke, for example. *See* Servicemembers' Group Life Insurance Traumatic Injury Protection Program Amendments, 85 Fed. Reg. 50973, 50974 (Aug. 19, 2020) (*Proposed Denial*). On August 19, 2020, the VA issued a notice of proposed rulemaking in which it proposed to deny Mr. McKinney's petition. *See id.* at 50983.

On March 15, 2023, the VA published a final rule that denied Mr. McKinney's rulemaking petition because, in the agency's view, expanding coverage to include illness or disease that materializes long after exposure to explosive ordnance (1) would be inconsistent with TSGLI's purpose of providing compensation for injuries occurring immediately after a traumatic event; (2) would be inconsistent with commercial accidental death and dismemberment (AD&D) insurance policies after which TSGLI is modeled; (3) would risk the financial health of TSGLI; and (4) would be inconsistent with the statutory requirement that covered losses "result[] directly from a traumatic injury . . . and from no other cause."  38 U.S.C. § 1980A(c)(1); *see Final Denial* at 15908–09.  The VA reasoned that there are too many different variables that could cause the various diseases and illnesses associated with explosive ordnance, and therefore the VA declined to extend TSGLI coverage to those illnesses and diseases. *Final Denial* at 15909.

Mr. McKinney now petitions us for review.  We have jurisdiction to review the VA's denial of a petition for rulemaking under 38 U.S.C. § 502.

## STANDARD OF REVIEW

"Pursuant to [38 U.S.C.] § 502, we review actions of the VA 'in accordance with chapter 7 of title 5,' i.e., under the relevant [Administrative Procedure Act] APA standard of review, 5 U.S.C. § 706." *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1353 (Fed. Cir. 2011) (citation omitted).  That review must be based on the "whole record" before the agency as of its decision.  5 U.S.C. § 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971).

In reviewing an agency's denial of a petition for rulemaking under 5 U.S.C. § 553(e), we must determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 414 (citation omitted).  This is a highly deferential standard, and our review of an agency's decision not

to promulgate a requested rule is "extremely limited." *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007) (citation omitted).

We must determine whether the VA's denial of Mr. McKinney's rulemaking petition provides a reasoned decision that adequately responds to the claims in the petition. *See, e.g.*, *Serv. Women's Action Network v. Sec'y of Veterans Affs.*, 815 F.3d 1369, 1374–75 (Fed. Cir. 2016) (in reviewing an agency's denial of rulemaking petition, we ask "whether the agency employed reasoned decisionmaking in rejecting the petition." (citation omitted)); *Preminger*, 632 F.3d at 1353 ("'[A]n agency's refusal to institute rulemaking proceedings is at the high end of the range' of levels of deference given to agency action under the 'arbitrary and capricious' standard." (citation omitted)).  When denying a petition for rulemaking, the VA must provide "a brief statement of the grounds for denial."   5 U.S.C. § 555(e).   The procedural requirements are "minimal," *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and all that is required to satisfy the arbitrary and capricious standard under the APA is a "rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). However, an unsupported denial or a "clear error in judgment" warrants reversal of a denial of a petition. *Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743 (D.C. Cir. 2017) (citation omitted).

DISCUSSION

Mr. McKinney advances three primary arguments in his petition for review.[3]  First, he contends that the VA's

---

[3]   In a filing made on the eve of oral argument, Mr. McKinney belatedly contends that the "extremely

several-year delay and alleged misrepresentation of his personal health information to outside medical experts constitute bad-faith adjudication of his petition. *See* Pet'r's Br. 35, 40. Second, Mr. McKinney argues that because the rulemaking record is incomplete, it must be supplemented before we can conduct a proper review of the VA's denial of his rulemaking petition. *See id.* at 42–43. Finally, Mr. McKinney asserts that the VA's denial of his petition is arbitrary and capricious because the VA failed to reasonably account for (1) the medical literature indicating that explosive ordnance follows a "disease process" and (2) the VA's rationales in prior rulemaking that compel the opposite conclusion from the one reached by the VA here. *See id.* at 50–57. We disagree with Mr. McKinney's arguments, and address each in turn.

## I. Bad Faith

Mr. McKinney identifies several examples of purported irregularities in the administrative record, arguing that they are "harbingers" of the VA's bad faith. *Id.* at 35. In particular, he points to (1) the VA's eight-year delay and supposed secrecy surrounding his rulemaking petition, and (2) the VA's reliance on purportedly flawed and obsolete medical evidence as indications of bad faith. *See id.* at 35–42. For example, Mr. McKinney asserts that the administrative record contains outdated medical evidence

---

limited" and "highly deferential" standard of review that applies to review of the VA's denial of a petition for rulemaking is no longer appropriate after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruled *Chevron* deference. ECF No. 59 at 2 (citing *Loper Bright*, 603 U.S. at 412); *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Mr. McKinney, however, does not explain why *Loper Bright* overturns the existing standard of review that applies to cases like this one. As this issue is not adequately briefed, we decline to consider it.

predating a 2010 paper by Masel and Dewitt, a paper that supports his rulemaking petition because it purportedly proves the existence of a causal link between an explosive ordnance, i.e., a traumatic event, and certain physical illnesses and diseases. *Id.* at 37–38; *see also* J.A. 1493–1504 (Masel and Dewitt paper). Mr. McKinney additionally argues that the VA mischaracterized his health profile when consulting with outside medical experts, thereby biasing them to be "even more skeptical" of his rulemaking petition. *Id.* at 40 (citing J.A. 1291–92). Mr. McKinney contends that the medical evidence in the record is accordingly tainted and cannot be used to support the VA's denial of his petition. *See id.* at 35–42. Mr. McKinney's arguments are not persuasive.

While the VA's protracted delay in addressing Mr. McKinney's petition is regrettable, the purported irregularities he listed are inadequate to support setting aside its decision. *Cf. Flyers Rts.*, 864 F.3d at 747 (remanding because "information critically relied upon by the agency" was not available for review by the appellate court). As an initial matter, the authorities that Mr. McKinney cites fail to substantiate the proposition that the VA acted in bad faith simply because it took many years to render a final denial of his rulemaking petition. *See* Pet'r's Br. 35–40. The cited cases merely characterize the agency's delays in those cases as "unreasonable" or "egregious," but they do not opine on whether those delays are indicators of bad-faith conduct. *See, e.g.*, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419–20 & n.12 (D.C. Cir. 2004) (agency's "six-year-plus delay is nothing less than egregious"). Indeed, one case attributes an unreasonable six-year delay to "bureaucratic inefficiency rather than bad faith." *Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 628 (D.C. Cir. 1987).

Moreover, although Mr. McKinney is correct that *some* of the VA's medical sources predate the Masel and Dewitt article, he does not explain why these citations evince bad

faith. *See* Pet'r's Br. 37–38; J.A. 1493. Additionally, the VA also relied on sources postdating the Masel and Dewitt 2010 article, and Mr. McKinney does not explain why these sources fail to support the VA's denial of his rulemaking petition. *See* Pet'r's Br. 37–38. Likewise, Mr. McKinney does not offer any persuasive reason why the VA acted in bad faith by relying on its 2016 consultations with outside medical experts to deny his petition for rulemaking.

Mr. McKinney's contention that the VA biased the outside medical experts is unavailing. He selectively references a portion of one interview summary that allegedly shows the VA mischaracterized his health history to elicit "'even more skeptical' reactions skewed to [the] VA's liking and against the rulemaking petition." Pet'r's Br. 40 (citing J.A. 1291–92). Even assuming the VA misrepresented Mr. McKinney's health history—an assumption we do not adopt—such a misrepresentation does not appear to have influenced the experts' views as to the medical theory underlying Mr. McKinney's petition: before "the facts of the petitioner's case [were] provided," the experts already explained that "if a biomarker showed that someone experienced a TBI and then later they experience a stroke, clinicians cannot definitely say the TBI caused the stroke as other factors . . . could have caused the stroke." J.A. 1291. Finally, to the extent Mr. McKinney is correct that the experts were misled in this particular interview, the record contains other interview summaries that do not mention or characterize Mr. McKinney's health history; each of these summaries likewise shows experts who are skeptical of Mr. McKinney's position that it is not difficult to show a causal relationship between exposure to explosive ordnance and downstream physical illness or disease. *See, e.g.*, J.A. 1288 ("Summary of Phone Conference with Col. Todd Rasmussen" stating it is "[v]ery difficult, next to impossible, to factually/scientifically prove causation between explosive ordnance and illness and disease in most cases"); J.A. 1289–90 ("Summary of Meeting with Dr. M.

Sean Grady" stating that "today's science would most likely not allow a Servicemember to prove that one of these illnesses/diseases was a direct result of the blast injury"). Without more, we therefore cannot find that the VA acted in bad faith in relying on the medical evidence in the administrative record to deny Mr. McKinney's rulemaking petition.

## II.  Incomplete Administrative Record

Mr. McKinney also contends that the administrative record is incomplete and therefore unreviewable because (1) there is no record in the Amended Index of Rulemaking[4] during five of the eight years that the petition was pending before the VA; (2) there is scant record of the VA meeting its statutory obligation to consult with the Department of Defense (DoD); (3) there is no actuarial assessment or relevant statistical data on which VA based its denial of the rulemaking petition; (4) there is no "Response Sheet" that Mr. McKinney separately obtained through a Freedom of Information Act request; and (5) there is piecemeal compilation of the record, which overcomes the presumption of regularity.[5]  Pet'r's Br. 42–44 (citation omitted).  We are not persuaded.

As the D.C. Circuit has explained, "the record needed to support an agency's decision not to engage in rulemaking can be sparser than that needed to support rulemaking." *Flyers Rts.*, 864 F.3d at 746.  In the case of a denial

---

[4]    The index contains a list of the records the VA relied on in its rulemaking process.

[5]    "The presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties." *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed. Cir. 2004) (citing *Butler v. Principi*, 244 F.3d 1337, 1339 (Fed. Cir. 2001)).

of rulemaking, "the 'record' for purposes of review need only include the petition for rulemaking, comments pro and con where deemed appropriate, and the agency's explanation of its decision to reject the petition." *WWHT, Inc. v. FCC*, 656 F.2d 807, 817–818 (D.C. Cir. 1981). On review of the record, we are satisfied that it contains the evidence the VA considered and is therefore sufficient to permit our review.

First, the VA offered a reasonable explanation for the time-gap of agency inactivity in the administrative record—it reflects the fact that the VA prioritized its Year-Ten Review of the TSGLI program at the expense of processing rulemaking petitions. *See* Resp't's Br. 35–36. Mr. McKinney does not contest the VA's explanation or explain why this gap frustrates our review. *See generally* Pet'r's Reply Br. Accordingly, we decline to infer that this gap in the administrative record renders the record unreviewable.

Second, Mr. McKinney does not explain why he believes the record lacks proof that the VA has met its obligation to consult with the DoD. *See* 38 U.S.C. § 1980A(j) ("Regulations under this section shall be prescribed in consultation with the Secretary of Defense."). In fact, the VA has produced its communications with the DoD, *see* J.A. 963 (discussing Year-Ten review with the DoD); J.A. 1341–42 (same); J.A. 1387 (DoD verbally signing off on the Year-Ten review), and Mr. McKinney does not dispute the veracity of those documents. He merely asserts that these communications are not enough under 38 U.S.C. § 1980A(j). Pet'r's Reply Br. 2–3. Under the circumstances, we reject this argument.

Third, Mr. McKinney does not explain why the VA is required by law to perform an actuarial assessment. The VA relies on a 2009 congressional report to show that adding illness or disease coverage to TSGLI would raise costs and require additional funding. *See* Resp't's Br. 37 (citing J.A. 572–74). Mr. McKinney is correct that the 2009 report

only examines the increased costs associated with adding coverage for Post-Traumatic Stress Disorder (PTSD), a mental disorder that is "separately considered from physical illness or disease." Pet'r's Reply 4–5 (citation omitted). But the VA's larger point was to show that both the 2009 report and Mr. McKinney's petition would substantially expand TSGLI coverage, creating a significant additional financial burden on the program. That was a reasonable observation for the VA to make. But even if the VA cannot rely on the 2009 report, Mr. McKinney does not point to any law or regulation mandating the VA to perform an actuarial assessment. We accordingly decline to find that the record is unreviewable without such assessment.

Fourth, although the "Response Sheet" from the Air Force was not in the administrative record, Mr. McKinney does not show why this would render the record unreviewable. Contrary to Mr. McKinney's claim, the exclusion of the "Response Sheet" does not harm Mr. McKinney, as the sheet shows the Air Force's opposition to Mr. McKinney's petition. *See* J.A. 9047. In any event, the VA's denial of Mr. McKinney's petition is amply supported by the record, even without this omitted document. *See infra.* Since the record supporting a denial of rulemaking petition only requires "comments pro and con where deemed appropriate," *WWHT*, 656 F.2d at 818, Mr. McKinney does not persuasively show why omission of the "Response Sheet" renders the record incomplete so as to frustrate our review. *See Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (concluding that a remand is unnecessary when "there is no reason to believe that the [agency] decision would have been different" (citations omitted)).

Finally, Mr. McKinney does not show how the VA's compilation of the record is so abnormal that the presumption of regularity is overcome. Mr. McKinney's reliance on *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 21 (D.D.C. 2002), *vacated in part*, 89 F. App'x 273 (D.C. Cir. 2004), is inapposite here. *See* Pet'r's Br. 44. In *Defenders*

*of Wildlife*, the district court deemed the missing records to be "significant" to the agency's denial to initiate rulemaking. 239 F. Supp. 2d at 21 n.10. Here, Mr. McKinney does not contend that any missing documents were "significant," or would otherwise meaningfully support his petition. *See generally* Pet'r's Br. Additionally, unlike in *Defenders of Wildlife*, where some of the missing documents were deliberately withheld based on improper assertion of the deliberative process privilege, *see* 239 F. Supp. 2d at 21 n.10, there is no such active obstruction here. The VA instead worked with Mr. McKinney to include records that he believed warranted inclusion in the record. *See* J.A. 9049–67. Mr. McKinney did not provide clear evidence to the contrary to disturb the presumption that "what appears regular is regular." *See Butler*, 244 F.3d at 1340 (citations omitted).

Upon our review of the administrative record, we find that the purported gaps Mr. McKinney identified are not fatal to our review of the VA's denial of Mr. McKinney's rulemaking petition.[6] The record not only contains comments pro and con where appropriate, but also includes the agency's explanation of its decision to reject Mr. McKinney's petition. *See WWHT*, 656 F.2d at 818. Accordingly, the record in this case has the required information for us to review whether the VA employed reasoned decisionmaking in rejecting the petition. *See Preminger*, 632 F.3d at 1353–54.

---

[6]    Mr. McKinney asks us to order the VA to certify the completeness of its Rule 17 index, *see* Pet'r's Br. 49–50, and the VA represents that it is prepared to certify said index, *see* Resp't's Br. 42–43. We agree with Mr. McKinney that Fed. Cir. R. 17(b)(2) requires that an agency certify the index it provides. We accordingly order the VA to certify the index of rulemaking record consistent with the requirements of Rule 17(b)(2).

16          MCKINNEY v. SECRETARY OF VETERANS AFFAIRS

### III. Arbitrary and Capricious Denial

Turning to the stated reasons for the denial of the rule-making petition itself, Mr. McKinney argues that the VA's decision is arbitrary and capricious because it ignores the crux of his petition—that physical illnesses or diseases caused by explosive ordnances follow a "disease process" similar to the illnesses and diseases resulting from Section 9.20's five enumerated exceptions currently covered by TSGLI. Pet'r's Br. 50. In particular, Mr. McKinney asserts that the VA arbitrarily and capriciously denied his rule-making petition by (1) not addressing his "disease process" argument; (2) taking a position contrary to its own regulation; and (3) relying on congressional intent that is not clear. Upon our review of the record, we determine that the VA did not act arbitrarily or capriciously in denying Mr. McKinney's rulemaking petition. Instead, we find that the VA engaged in reasoned decisionmaking and was sufficiently responsive to Mr. McKinney's petition. Mr. McKinney's three arguments to the contrary are not persuasive, and we address them in turn.

First, Mr. McKinney is incorrect that the VA did not address his "disease process" argument in its denial of his rulemaking petition. The VA disagreed with Mr. McKinney's attempt to draw a direct comparison between illness or disease *caused by* Section 9.20's enumerated exceptions and illness or disease (such as stroke) *associated with* explosive ordnance because the latter relationship is far more attenuated. *See Final Denial* at 15908. According to the VA, "courts have interpreted the phrase 'direct result of a traumatic injury and no other cause' that 38 C.F.R. § 9.20(d)(2) uses to mean that a loss is not covered if a preexisting condition or disease 'substantially contributed' to the loss." *Id.* (citation omitted). In other words, TSGLI allows "[a] payment [to] be made . . . only for a qualifying loss that results directly from a traumatic injury . . . and from no other cause." 38 U.S.C. § 1980A(c)(1); *see also Proposed Denial* at 50983 ("The plain language of 38 U.S.C.

[§] 1980A(a)(1) and (2), (b)(1), (c)(1) and (2) authorizes TSGLI benefits for a qualifying loss *resulting directly* from a 'traumatic injury.'" (emphasis added)).   Under Section 9.20, the VA chose to allow for coverage for illness or disease caused by the five specified exceptions (such as chemical weapons) because "the physical damage resulting in a covered loss would generally occur immediately and require prompt medical treatment" and because the damage would immediately trigger the "disease process" causing the downstream illness or disease.   Traumatic Injury Protection Rider To Servicemembers Group Life Insurance, 70 Fed. Reg. 75940, 75941 (Dec. 22, 2005), J.A. 23–24.   The VA did not find the necessary proof of a similar, categorical causal relationship in this record for the theory underlying Mr. McKinney's petition.   Although the VA acknowledged that "several conditions . . . have a positive association with TBI," the VA also found that "these conditions do not immediately manifest." *Final Denial* at 15909.   The VA further explained that "the types of long-term illnesses and diseases associated with TBI do not cause the immediate type of harm against which TSGLI is designed to protect." *Id.*   Mr. McKinney disputes this characterization, but the VA's conclusion finds support in the administrative record.

Third-party medical doctors and researchers, for example, acknowledged that the long latent periods after exposure to an explosive ordnance before a physical illness or disease manifests make it "almost impossible in most cases to prove that the explosive ordnance, and no other factors, caused the illness/disease." J.A. 1288; *see also* J.A. 1291 (two doctors noting that "many common symptoms of TBI are also symptoms of other psychological conditions"). Mr. McKinney does not explain why the VA acted arbitrarily or capriciously in crediting medical sources showing an inconclusive causal relationship between explosive ordnance, TBI, and subsequent illness or disease.   In our view, the VA's denial adequately responded to Mr. McKinney's rulemaking petition, acknowledging the mixed record for

and against granting Mr. McKinney's petition. *See generally Final Denial*; *Proposed Denial*; *Motor Vehicles*, 463 U.S. at 43.

Second, the VA did not arbitrarily and capriciously take a position contrary to its regulation in denying Mr. McKinney's petition. The TSGLI program currently provides that to receive benefits, one "must suffer a scheduled loss . . . within two years of the traumatic injury." 38 C.F.R. § 9.20(d)(4). According to Mr. McKinney, this provision proves one does not need a physical illness or disease to immediately manifest, as the VA claimed in its denial. Pet'r's Br. 55 (citing *Proposed Denial* at 50983). Mr. McKinney contends that it is therefore arbitrary and capricious to deny his rulemaking petition just because the TBI-induced illnesses or diseases "may have a latency of months to years before manifesting." *Id.*

Mr. McKinney misunderstands the VA's denial of his rulemaking petition. He points to the Chen study[7] the VA cited in its denial of his rulemaking petition, which shows that the average time between treatment for TBI and the onset of stroke was 543 days. Pet'r's Br. 56; *see Final Denial* at 15909; *Proposed Denial* at 50983. Because 543 days is within the two-year eligibility period where one is eligible for TSGLI benefits, Mr. McKinney believes that the VA wrongfully denied his rulemaking petition. *See* Pet'r's Br. 55–56.

The VA established the two-year eligibility period as a "response to concerns from the uniformed services that one year was not enough time for a member to decide whether to attempt to salvage a limb." *Final Denial* at 15908. This eligibility period does not relate to the reason why the VA

---

[7]    *See* Yi-Hua Chen et al., *Patients with Traumatic Brain Injury: Population-Based Study Suggests Increased Risk of Stroke*, 42 STROKE 2733 (2011) (Chen study).

denied Mr. McKinney's petition, which instead is based on the insufficiently proven causal relationship between downstream illnesses and diseases and explosive ordnance. *See id.* at 15909. The VA cited the Chen study, *see supra* n.7, showing the long latent period between TBI and stroke onset as further evidence that the direct causal relationship Mr. McKinney theorized in his rulemaking petition is less than clear. *See Proposed Denial* at 50982–83. The VA therefore did not take a position contradictory to its regulation.

Finally, Mr. McKinney is incorrect that there is no legislative support for the VA's denial of his rulemaking petition. Mr. McKinney argues that the one-page congressional record discussing the establishment of TSGLI "provides no hint of the two year period that VA introduced in its TSGLI regulation," and the VA cannot rely on the record to deny the rulemaking petition. Pet'r's Br. 56 (emphasis in original). But the reason why the VA cited the TSGLI's legislative history is because it shows that "Congress intended to provide TSGLI compensation for injuries, rather than diseases, that *occur immediately after* a traumatic event and that require prompt medical treatment." *Final Denial* at 15909 (emphasis added); *see also* J.A. 18 (statement of Senator Craig discussing the purpose of the TSGLI program, which is to provide "immediate payment" to wounded veterans "to sustain them before their medical discharge from the services, when veterans benefits kick in"). The VA thus reasoned that covering physical illnesses or diseases that may manifest years after the traumatic event would be inconsistent with the program's purpose. *Final Denial* at 15909. The VA further explained that "Congress knows how to include TSGLI coverage for diseases if it so desires, and it did not do so." *Proposed Denial* at 50983 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

CONCLUSION

We appreciate Mr. McKinney's effort in urging the VA to amend its regulations to expand TSGLI coverage to a new category of conditions that can be caused by explosive ordnance. However, under the circumstances, the VA did not abuse its wide discretion in declining to amend its regulations. At bottom, many of the arguments raised involve agency policymaking choices that are beyond this court's purview, and there is nothing in the record that warrants setting aside the VA's decision in light of the highly deferential and extremely limited review we have over the VA's denial of a proposed rulemaking petition.

We have considered Mr. McKinney's remaining arguments and find them unpersuasive. For the foregoing reasons, we deny Mr. McKinney's petition for review.

**DENIED**

COSTS

No costs.